IN RE:

| | |
|---|---|
| BARRETT HOLLOWAY MOORE, | Chapter 7 |
| | Case No. 17-20106-dob |
| Debtor. | Hon. Daniel S. Opperman |

_____ /

BRAD THOR,

    Plaintiff,

v.                                                                                     Adv. Pro. No.

BARRETT HOLLOWAY MOORE,

    Defendant.

_____/

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6)**

Brad Thor, by and through his counsel, OSIPOV BIGELMAN, P.C., for his Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), states as follows:

PARTIES AND JURISDICTION

1. On January 24, 2017 (the "Petition Date"), Barrett Holloway Moore ("Defendant") filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division, initiating Case No. 17-20106.

2. Defendant is an individual and, upon information and belief, is a resident of Cheboygan County, Michigan, and does business in Cheboygan County, Michigan.

Page **1** of **14**

3. Brad Thor ("Plaintiff") is a resident of Tennessee, and is a creditor in the underlying bankruptcy case.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTUAL ALLEGATIONS

7. Starting in 2007, Defendant, individually and through multiple entities, including McMichael Road, LLC ("McMichael"); Bearing360, LLC ("Bearing360"); and Sovereign Deed, a now-defunct private "disaster response" firm; solicited wealthy individuals for hundreds of thousands of dollars, in exchange for offering "safe haven" during disaster and emergency events.

8. Between September 2009 and March 2010, Plaintiff paid Defendant $100,000.00[1] for Plaintiff and his family to have access to a purported "safe haven" facility allegedly owned by McMichael and located at 1566 McMichael Road, Burt Lake, Michigan (the "Facility"). Exhibit A, March 22, 2010 Letter Agreement.

9. Plaintiff and McMichael executed an agreement dated March 22, 2010, which memorialized Defendant's discussions with Plaintiff regarding the use of the haven. Defendant signed that agreement as manager of McMichael.

10. Defendant represented to Plaintiff that the Facility was "capable of supporting and sustain [sic] our family during periods of disaster, war, and economic dislocation." Exhibit A.

---

[1] The $100,000.00 was paid by Plaintiff via four separate checks, written to Defendant personally, not McMichael Road, LLC. Those payments were made as follows: $15,000.00 on September 25, 2019; $25,000.00 on December 9, 2009; $10,000.00 also on December 9, 2009; and $50,000.00 on March 22, 2010, the date the agreement was signed.

Page **2** of **14**

11. Prior to entering into the Agreement, Defendant represented to Plaintiff that, upon payment of the $100,000.00, Plaintiff and his family would have lifetime access to the Facility as a "safe haven."

12. During the period in which Defendant made these representations to Plaintiff, McMichael and Defendant were in default under the terms of certain loans with Citizens National Bank, which were secured by the property on which the Facility was located, they were behind on mortgage payments totaling $229,980.76, and they failed to pay property taxes for 2007-2009, totaling $127,812.33.

13. Despite his representations that Plaintiff and his family would have lifetime access to the Facility as a "safe haven," Defendant and McMichael were in serious jeopardy of losing the Facility property to foreclosure.

14. On May 24, 2010, Citizens National Bank filed a multi-count complaint against Defendant and other obligated parties, including McMichael, the fee title holder of the haven, on the loan debt, Defendant's guaranty, and for judicial foreclosure of the Facility property.

15. Based on Defendant's representations about the Facility, Plaintiff entrusted hundreds of thousands of dollars of Plaintiff's personal property to Defendant and McMichael for safekeeping at the Facility between 2010 and 2013, including outdoor/survival clothing, tactical gear, communication devices, firearms, ammunition, survival books, and other survival supplies (the "Survival Gear").

16. Defendant encouraged and counseled Plaintiff to send the Survival Gear to the Facility so that it would be available in the event that Plaintiff and his family would need to use the "safe haven."[2]

### The Pallets

17. On January 13, 2011, Plaintiff gave Defendant $175,000.00 in exchange for Defendant giving Plaintiff a Bill of Sale to 158 pallets of dehydrated foods and 10 pallets of surgical masks (the "Pallets"), to be kept at or near the Facility for Plaintiff. Exhibit B, January 13, 2011 Bill of Sale.

18. Defendant represented to Plaintiff that the Pallets would be kept at a hangar located at the Pellston Airport near the Facility.

19. In the fall of 2012, Defendant personally showed Plaintiff what Defendant represented to be Plaintiff's Pallets in a hangar at the Pellston Airport.

20. On July 15, 2014, contrary to his prior representations, Defendant swore in an affidavit that Plaintiff's Pallets were, and supposedly had always been, located at a warehouse in Lake County, Illinois, over 400 miles away from the Facility.

21. In a subsequent affidavit signed by Defendant on September 16, 2014, Defendant swore that the $175,000.00 given to him by Plaintiff was a loan, that Defendant never intended to actually sell the Pallets to Plaintiff, and that Defendant had no idea what happened to the Pallets. Exhibit C, Affidavit of Barrett H. Moore, September 16, 2014.

---

[2] At Defendant's direction, and in an effort to keep Defendant's name and address out of databases, Plaintiff sent deliveries of Survival Gear and personal property to the Facility, addressed to Defendant's deceased mother, Linda Meyers.

## The Gold Coins

22. In the fall of 2012, Plaintiff entrusted 10 one-ounce gold maple-leaf coins, valued at more than $17,000.00, to Defendant's and McMichael's possession for safekeeping, for Plaintiff's use during an emergency or disaster event.

23. In mid-April 2013, Defendant solicited Plaintiff to purchase 30 one-ounce gold maple-leaf coins from Bearing360, purportedly to help Bearing360 "make ends meet."

24. Plaintiff agreed to purchase 15 of the 30 coins from Bearing360 for $21,225.00, and, at Defendant's direction, Plaintiff wire transferred the funds to Bearing360's account at Awakon Federal Credit Union. Exhibit D, April 13, 2013 Email; Exhibit E, April 23, 2013 Wire Transfer Request.

25. Upon receipt of Plaintiff's funds in Bearing360's account, Defendant promptly transferred $20,000.00 to another entity he controlled, Great Northern Services, LLC, without informing Plaintiff.

26. Defendant suggested to Plaintiff that Defendant should store the purchased coins with the other coins Plaintiff had entrusted to Defendant.

27. Defendant represented to Plaintiff that he placed Plaintiff's original 10 gold coins and the purchased 15 gold coins (the "Gold Coins") in one of seven hidden safes within Defendant's home and at the Facility, in safekeeping for Plaintiff.

28. On May 2, 2013, Defendant informed Plaintiff that the Gold Coins Plaintiff entrusted to Defendant and McMichael for safekeeping were "missing."

29. Defendant claimed that he noticed the Gold Coins disappeared from a storage closet within the Facility back on June 25, 2013 (where Defendant allegedly put the Gold Coins after removing them from a safe).

30. In August 2013, Defendant told Plaintiff that the gold coins had been stolen by a former consultant who was briefly employed by Defendant.

31. Neither Defendant nor Bearing360, or McMichael as the ostensible owner of the Facility, filed any police report or insurance claim regarding the disappearance of the Gold Coins.

### The LARC Loan

32. On May 3, 2013, Defendant solicited Plaintiff for a $35,000.00 loan (the "LARC Loan"), specifically to finance Bearing360's purchase of a LARC amphibious vehicle from government surplus, pending Bearing360's receipt of expected funds from investor John M. "Jack" Templeton, Jr. ("Templeton").

33. Specifically, Defendant, individually and as the agent for Bearing360, stated that Plaintiff would be repaid the $35,000.00 in two weeks, plus a $10,000.00 premium, with the vehicle serving as security for the Loan. Exhibit F, May 2, 2013 Email Offer.

34. More represented that "both the buy side and sell side of the transaction are nailed down, with a nice guaranteed return built in." Exhibit F.

35. On May 3, 2013, Plaintiff loaned Defendant and Bearing 360 $35,000.00 in reliance on Defendant's representations.[3] Exhibit G, May 3, 2013 Wire Transfer Request.

36. When Plaintiff subsequently inquired whether Templeton's funds had come in, Defendant denied receiving anything, despite Defendant and Bearing 360 having received over $500,000.00 from Templeton.

37. To date, neither Defendant nor Bearing360 have made any repayment of Plaintiff's principal investment of $35,000.00 or the $10,000.00 premium promised, despite the LARC Loan's terms and Defendant's representations.

---

[3] The $35,000.00 loan funds were wire transferred to Bearing360's account at Awakon Federal Credit Union.

### The Dissolution of the Business Relationship and Friendship

38. In early December 2013, when Plaintiff asked Defendant about repayment of the LARC Loan that was already six months overdue, Defendant represented to Plaintiff that neither he nor Bearing360 had the funds to repay Plaintiff.

39. Over the next several weeks, Plaintiff and Defendant continued discussions about Defendant's failure to repay the LARC Loan and Plaintiff's frustration regarding the alleged "disappearance" of the Gold Coins.

40. On December 17, 2013, Defendant abruptly informed Plaintiff that their friendship and their business relationships were over, requesting that Plaintiff remove his personal property from the Facility, and representing that Defendant would repay the LARC Loan as soon as he could. Exhibit H, December 17, 2013 Emails.

41. Defendant also informed Plaintiff that he took responsibility for the "disappearance" of the Gold Coins and would remedy Plaintiff's loss. Exhibit H.

42. Beginning in December 2013, Defendant, individually and as the agent for McMichael, delayed and interfered with Plaintiff's efforts to retrieve his personal property and has ignored Plaintiff's requests for repayment of the LARC Loan and reimbursement for the Gold Coins.

43. On May 7, 2014, Plaintiff demanded the refund of his $100,000.00 investment with McMichael, pursuant to the terms of their agreement. Exhibit A.

44. On August 13, 2014, Plaintiff demanded immediate possession of the Pallets, resulting in Defendant's denial of any knowledge of the Pallets' location. Exhibit C.

Circuit Court Case

45. On July 31, 2014, Plaintiff filed a multi-count complaint against Defendant and McMichael in Cheboygan County Circuit Court.

46. On or about December 8, 2014, Plaintiff filed a First Amended Complaint in the Circuit Court Case alleging the following claims: (I) Statutory Conversion - Pallets; (II) Fraud - Pallets; (III) Action on Demand Note; (IV) Statutory Conversion - Survival Gear; (V) Claim and Delivery – Survival Gear; (VI) Statutory Conversion – Gold Coins; (VII) Claim and Delivery – Gold Coins; (VIII) Fraud – Gold Coins; (IX) Breach of Fiduciary Duty; (X) Fraudulent Misrepresentation – LARC Loan; (XI) Breach of Contract – LARC Loan; (XII) Breach of Contract – Facility Membership; (XIII) Unjust Enrichment. Exhibit I.

47. On March 14, 2016, Defendant offered to enter into a $350,000.00 judgment per MCR 2.405, as a settlement of all of Plaintiff's claims against Defendant and McMichael Road, LLC, including claims made by Plaintiff which were resolved in whole or in parts by the Circuit Court's ruling on various motions for summary disposition, as well as Plaintiff's claims currently unresolved. Exhibit J.

48. Plaintiff accepted Defendant's March 14, 2016 settlement offer.

49. On March 30, 2016, the Circuit Court entered the stipulated Judgment. Exhibit K.

**COUNT I: FALSE REPRESENTATIONS
AND ACUTAL FRAUD PURSUANT TO 11 U.S.C. § 523(a)(2)(A)**

The Pallets

50. Plaintiff incorporates by reference all prior paragraphs.

51. Defendant falsely represented to Plaintiff that Defendant was selling 158 pallets of dehydrated food and 10 pallets of surgical masks to Plaintiff for the price of $175,000.00.

52. This misrepresentation was material.

53. Defendant made this misrepresentation to Plaintiff in bad faith, with no intent to actually perform, and knowing that the representation was false.

54. Defendant offered the Pallets, and the Bill of Sale to them, as a false token – a device to perpetrate a fraud.

55. Defendant made the fraudulent misrepresentation about the Pallets with the intent to deceive Plaintiff and with the intent that Plaintiff would rely on it.

56. Plaintiff did in fact rely on the misrepresentation, by paying $175,000.00 to Defendant.

57. Plaintiff's reliance was justifiable.

58. As a direct and proximate result of Defendant's misrepresentations, Plaintiff suffered damages of not less than $175,000.00.

## The Gold Coins

59. Plaintiff incorporates by reference all prior paragraphs.

60. Defendant falsely represented to Plaintiff that Defendant and Bearing360 were selling 15 gold coins to Plaintiff in exchange for Plaintiff's payment of $21,225.00, and that Defendant would hold all of Plaintiff's Gold Coins in safekeeping for Plaintiff.

61. These misrepresentations were material.

62. Defendant made these fraudulent misrepresentations to Plaintiff in bad faith, with no intent to actually perform, and knowing that the representations were false.

63. Defendant offered the 15 gold coins from Bearing360, and the offer of safekeeping for all of Plaintiff's gold coins, as false tokens - as devices to perpetrate a fraud.

64. Defendant made the fraudulent misrepresentations with the intent to deceive Plaintiff and with the intent that Plaintiff would rely on them.

65. Plaintiff did in fact rely on the misrepresentations, by paying $21,225.00 to Defendant, and by delivering 10 one-ounce maple-leaf gold coins to Defendant.

66. Plaintiff's reliance was justifiable.

67. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff has suffered damages of not less than $38,000.00.

### The LARC Loan

68. Plaintiff incorporates by reference all prior paragraphs.

69. Defendant, individually and as agent of Bearing360, made the following representations to Plaintiff about the LARC Loan to Defendant and Bearing360: (a) the buy and sell side of the transaction were "nailed down," with a "nice guaranteed return built in," and (b) Defendant and/or Bearing360 would repay Plaintiff the $35,000.00, plus a $10,000.00 premium in two weeks, once funds were received from Templeton.

70. These misrepresentations were material.

71. Defendant's representations were false at the time they were made and were made in bad faith, as the buy and sell sides of the transaction were not "nailed down," nor was there a "guaranteed return," and/or Defendant had no intention of repaying Plaintiff when Templeton's funds were received.

72. Defendant knew that the representations were false and made in bad faith when he made them.

73. Defendant intended to deceive Plaintiff and that Plaintiff would rely on the misrepresentations.

74. Plaintiff did, in fact, rely on Defendant's fraudulent misrepresentations in agreeing to make the LARC Loan.

75. Plaintiff's reliance was justifiable.

76. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff has suffered damages in excess of $45,000.00.

### Facility Membership

77. Plaintiff incorporates by reference all prior paragraphs.

78. Defendant, McMichael Road, LLC, and Plaintiff entered into a contract (the "Agreement"), pursuant to which Plaintiff paid $100,000.00 in exchange for Defendant and McMichael agreeing to provide a "safe haven" for life for Plaintiff and his family at the Facility, in the event of a future disaster or emergency event.

79. Defendant represented to Plaintiff that, upon payment of the $100,000.00, Plaintiff and his family would have lifetime access to the Facility.

80. This representation was material.

81. During the period in which Defendant made these representations to Plaintiff, Defendant was in default under the terms of certain loans with Citizens National Bank, which were secured by the property on which the Facility was located, he was behind on mortgage payments totaling $229,980.76, and he failed to pay property taxes for 2007-2009, totaling $127,812.33.

82. Despite his representations that Plaintiff and his family would have lifetime access to the Facility as a "safe haven," Defendant knew that he was in serious jeopardy of losing the Facility property to foreclosure at the time the representations were made.

83. Defendant failed to disclose to Plaintiff that Defendant was in jeopardy of losing the Facility property to foreclosure at the time Defendant solicited Plaintiff to enter into the Agreement and after Plaintiff entered into the Agreement.

84. In the fall of 2011, the Facility property was lost in a bank foreclosure.

85. Defendant made the misrepresentations knowing that they were false, or made them with gross recklessness as to their truth.

86. Defendant intended to deceive the Plaintiff and intended that Plaintiff would rely on the misrepresentations.

87. Plaintiff did, in fact, rely on Defendant's misrepresentations paying the $100,000.00 to Defendant and entering into the Agreement.

88. Plaintiff's reliance was justifiable.

89. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff has suffered damages in excess of $100,000.00.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court declare that the debt owing by Defendant to Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**COUNT II: FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY AND EMBEZZLEMENT PURSUANT TO 11 U.S.C. § 523(a)(4)**

90. Plaintiff incorporates by reference all prior paragraphs.

91. Plaintiff entrusted the Survival Gear, Pallets, and Gold Coins to Defendant's possession and control for safekeeping.

92. Plaintiff and Defendant intended to create a trust relationship, pursuant to which Plaintiff entrusted to Defendant the Survival Gear, Pallets, and the Gold Coins, and Defendant was to hold the Survival Gear, Pallets, and Gold Coins for Plaintiff's use an emergency or disaster scenario.

93. Defendant was the trustee, and he was acting in a fiduciary capacity with regard to the Survival Gear, Pallets, and the Gold Coins.

94. Plaintiff was the beneficiary of the trust relationship, as the Survival Gear, Pallets, and Gold Coins were held by Defendant for the benefit of the Plaintiff and for Plaintiff's use in an emergency or disaster scenario.

95. Defendant fraudulently appropriated the Survival Gear, Pallets, and Gold Coins for a use other than the use for which it was entrusted.

96. Upon information and belief, Defendant sold the Gold Coins to a gold dealer on or about May 2, 2013.

97. Certain of the Survival Gear has also "disappeared."

98. The circumstances surrounding the "disappearance" of the Gold Coins and Pallets indicate fraud.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court declare that the debt owing by Defendant to Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

### COUNT III: WILLFUL AND MALICIOUS INJURY BY THE DEBTOR PURSUANT TO 11 U.S.C. § 523(a)(6)

99. Plaintiff incorporates by reference all prior paragraphs.

100. Plaintiff entrusted the Survival Gear, Pallets, and Gold Coins to Defendant's possession and control for safekeeping.

101. Plaintiff has repeatedly demanded that Defendant return the Survival Gear, Pallets, and Gold Coins.

102. Defendant has failed and/or refused to return the Survival Gear, Pallets, and Gold Coins to Plaintiff's possession or otherwise remunerate Plaintiff for the value of same.

103. Defendant has unlawfully failed to return and has improperly asserted dominion over the Survival Gear, Pallets, and Gold Coins, despite multiple demands from Plaintiff to return them to his rightful possession.

104. Upon information and belief, Defendant sold the Gold Coins to a gold dealer on or about May 2, 2013.

105. Defendant has unlawfully converted Plaintiff's Survival Gear, Pallets, and Gold Coins, resulting in damages to Plaintiff.

106. Defendant had the specific intent to injure Plaintiff by depriving him of the Survival Gear, Pallets, and Gold Coins, or was substantially certain that Plaintiff would be injured by his conversion of the Survival Gear, Pallets, and Gold Coins, as Defendant knew that Plaintiff was relying on same in the event of an emergency or disaster scenario.

107. Defendant committed the wrongful act of conversion of the Survival Gear, Pallets, and Gold Coins, intentionally, and without any just cause or excuse.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court declare that the debt owing by Defendant to Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

                                                                        Respectfully submitted,

                                                                         OSIPOV BIGELMAN, P.C.

Dated: April 28, 2017                            /s/ Jeffrey H. Bigelman
                                                                            Jeffrey H. Bigelman (P61755)
                                                                             Counsel for Plaintiff, Brad Thor
                                                                             OSIPOV BIGELMAN, P.C.
                                                                             20700 Civic Center Drive, Suite 420
                                                                             Southfield, MI 48076
                                                                             Tel: 248-663-1800/Fax: 248-663-1801
                                                                             jhb_ecf@osbig.com